We'll hear argument next in Case 10-1293, Federal Communications Commission v. Fox Television Stations. General Verrilli. Mr. Chief Justice, and may it please the Court, in its previous decision in this case, the Court observed that when a broadcast licensee takes a license for the free and exclusive use of a valuable part of the public domain, it also accepts enforceable public obligations. One of those enforceable obligations is the indecency restriction, which Congress has instructed the Federal Communications Commission to enforce between the hours of 6 a.m. and 10 p.m. Respondents in this case have for years benefited enormously from their free and exclusive use of public spectrum. They argue, however, that neither Congress nor the Commission may, as a condition of their licenses, require that they refrain from broadcasting indecent material when children are most likely to be in the audience. But, General Verrilli, it seems to me that this contract notion of yours can only go so far. I mean, if the idea is just we gave them something, now they have to do whatever we say, you wouldn't accept that. So the question is, why is this condition appropriate when many other conditions would not be appropriate? I mean, tell me if I'm wrong or appropriate, but I frankly think you wouldn't. This condition is appropriate, Justice Kagan, because it has been a defining feature of the broadcast medium from its inception in the 1920s in the Radio Act and has continued to be a defining feature of this medium throughout its history. And the argument that my friends on the other side are making here is that that norm, that legally enforceable norm, which has been recognized by this Court in Pacifica and has applied since the inception of this medium, needs to be overturned now because circumstances have changed. And I would point out first, if I may, something else. Scalia. Well, that's one of their arguments. I mean, another one is that you haven't defined it precisely enough, right? Verrilli, Yes. Scalia. That's a separate, really a separate argument. Verrilli, That's certainly true, Justice Scalia, and I will certainly get to vagueness if I may just continue on this line. Their argument is that circumstances have fundamentally changed. I want to point out at the outset something I think is significant, which is that their argument would sweep away indecency restriction with respect to radio as well as television, and they would sweep that away in the arguments they are making today without making any showing that circumstances have changed at all with respect to the ubiquity or accessibility of radio. And I think if one looks at the FCC orders that this Court cited in its prior decision in this case, one would see that a lot of the most vile and lewd material really is in radio. So I just want to put that marker down at the beginning here, because I do think it is quite important. No showing has been made about radio. Kennedy, I didn't quite understand it. Today, there's either a potential or a fact of violent and objectionable broadcasting in radio? I didn't quite just understand  Verrilli, Yes, but Pacifica itself, Justice Kennedy, was a case about a radio broadcast. Kennedy, Yes, I understand that, yes. Verrilli, And the Respondents are arguing in this case that Pacifica ought to be overruled because the circumstances that justified its rule no longer obtained. I want to put a marker in at the outset here with respect to radio, because I do think it's quite important that they haven't made any argument that those circumstances are any different with respect to radio. It's just as ubiquitous as it was. There isn't even any argument that there's blocking technology available. And I want to make sure, given the kind of vile material that the record demonstrates has been transmitted over time on radio, that the Court focuses on the breadth of the argument that the Respondents are making here. Now, with respect to television, I do think they're making an argument that television broadcasting is no longer uniquely pervasive in the way that it was before. They're not making an argument, but that, if I may, is a very different kind of argument than one would normally get in support of a suggestion that we ought to depart from stare decisis. They're not arguing that broadcast television is any less pervasive than it was. If anything, it's probably more pervasive now. They're not arguing that the harms of that pervasiveness no longer exist. What they're arguing is that there are other media that present harms as well, and that with respect — and that because those other media also present harms, the circumstances require a change in the rule with respect to broadcasters. Now, that can — you can, I think, look at that one of two ways. You can say either that's an argument that it's futile to continue to impose this restriction on broadcasters, and I think that's what Fox says at page 33 of its brief. Two points in response to that. I think a significant, if not complete, answer was in this Court's prior decision in this case in which it said that the maintenance of a safe haven is actually particularly important in the context of these changes, a broadcast safe haven. And also, I do think that the idea of futility in that nature is foreign to our First Amendment jurisprudence. Ginsburg, really, I took it from the briefs and what the FCC has been doing that the major objection is that one cannot tell what's indecent and what isn't. That it's FCC, the censor, that's saying Private Ryan is okay, Schindler's List is okay, but NYPD Blues is not. And I do think that that is the major objection, that we have a government agency that is going to make decisions about when nudity is okay and when it isn't. You can't do it in terms of time, because New York, the NYPD was 7 seconds, and another broadcast, Catch-22, was 40 seconds. So it's the appearance of arbitrariness about how the FCC is defining indecency in concrete situations. That, I think, is the major problem. Look, let me turn to that, Justice Ginsburg. The two points about that, the first one is that as we read this Court's recent decision in the Humanitarian Law Project, the question on the Fifth Amendment analysis of whether there is vagueness in arbitrary enforcement has to be answered by reference to the specific broadcasts at issue here. In other words, was there fair notice with respect to these specific broadcasts? And I will get to that, but let me first go directly to Your Honor's more significant question. And I think the problem with looking at the case that way is that the lens is focused too narrowly, in that there actually, if one broadens out the lens and looks at the wide range of decisions that the Commission is making about indecency and then broadens it out even further and looks at the wide range of broadcasts that occur, actually the number of broadcasts that have been identified as even raising a question of arbitrariness or inconsistency is really quite a minuscule fraction. It's even quite a minuscule fraction even with respect to broadcasts that the Commission has adjudicated as indecent or nonindecent. And, yes, we would concede that there is not perfect clarity in this rule. It's a context-based rule. As we read Pacifica, the Court suggested in Pacifica that a context-based rule may well be what the Constitution requires here, and that's going to result in something less than absolute precision. But the — of course, the alternative, I would assume from my friend's perspective, would be worse. The Commission could have a list that said never say the following however many words, never show broadcasting between the hours of 6 a.m. — nudity between the hours of 6 a.m. and 10 p.m. That would be clearer, but it would — but in a way, the Commission here, I think, by following the context-based approach that I think Pacifica suggested was required, is being — I mean, punished is too strong a word, but it's being held against it that it's trying to make reasonable accommodations for First Amendment values. And so I think when one looks at it both in terms of where the lens is actually ought to be focused here, and the fact that the alternative of perfect clarity would reach a less effective accommodation of First Amendment values, then I do think the Commission's position is quite — quite reasonable. Breyer. Could you digress for one minute to help me understand the procedural posture of this case? When it was here last time, we were dealing with an issue called fleeting expletives. And that was Fox. And the Fox case involved just that. They didn't really, or we didn't, or the Court didn't, attack the 2001 order, which is now at issue. And then without it going back to the Commission, the Second Circuit decided it on a ground that sets aside the 2001 order. Now, can we here just decide the fleeting expletive case? Because the fleeting expletive case has to do with one subset of applications of the 2001 order, and it has to do with Part 2.2 or something. I mean, it has — and how you interpret the words, material dwells on or repeats. Now, that I — that I understand how to get at. The ABC case raises — doesn't raise fleeting expletives. It wasn't fleeting. And it raises the question of the validity of, under vagueness grounds, of 2001 industry guidance and how that's been applied. But the Second Circuit didn't deal with that case. It sent it back to the Commission. So has there been a Commission decision recently which has reviewed the basic arguments being made here about the validity of the 2001 industry guidance has applied? Has there been such a thing? Alternatively, has there been an appeals court holding on the analysis of the ABC case? Verrilli, I agree with you, Justice Breyer, A, that this is a complex procedural posture, B, that the Court would have some discretion in how it approached and resolved the case. With respect to the ABC case, as I read the Commission's orders, which are in the appendix to the petition, it applied the 2001 industry guidance to reach the conclusion that the ABC broadcast was indecent. And then that was — that — then ABC appealed that to the Second Circuit, as I understand it, and that the Second Circuit then found that the — that the Commission had violated the Constitution in reaching that result at first. Breyer, they didn't — they didn't in that case, and they sent the ABC case back. I see your — They did on — when it came back, Your Honor, they then — they disposed of the Fox case with a lengthy opinion and essentially applied that analysis to the ABC case. So I think fairness — all right. When this ABC case was argued in front of the Commission, I have here about 30 briefs at least, maybe 40, and they are filled with very good arguments. Were those arguments made to the Commission in the context of the ABC case? Because as it comes up here, we are — whereas I thought when we granted cert, quite honestly, that this was Fox coming back, as I've read the brief, it isn't at all. This is a new case, nothing to do with what we've decided before. This is the case of ABC, period. And it is a tack on the 2001 guidelines, not fleeting expletives. And therefore, I want to know, at least satisfy myself, that this ABC case has gone through ordinary procedures, and indeed, these arguments have all been made in front of the Commission and they've been rejected. So, Justice Breyer, I'm not sure that I can vouch for the proposition that the arguments have all been made in front of the Commission and they've been rejected. I'm not saying every one that has the essence of these arguments. In fairness, I do think that if one reads the Commission's disposition of the ABC case, it is applying the 2001 guidance, reaching the conclusion that the broadcast was indecent under the 2001 guidance. ABC paid the fine that it was assessed, and then, as it has — as it can do, then invoked the Hobbs Act, went to the court of appeals to challenge it. So I do think — I do actually think that the issues have been considered by the agency and are before the Court. And I do agree with Your Honor, moving, I think, more directly to the vagueness point, that there really isn't a vagueness issue left with respect to the fleeting expletives in the Fox case, because the Court said the last time the case was here that — that there is no problem of arbitrary punishment because there was no forfeiture or any other sanction. ABC is in a different position because they were sanctioned, and so there is an issue with respect to the question of whether the Commission's indecency standards can constitutionally be applied here and whether they are too vague. But I do think, and I do — I would like to spend a minute on that question of whether there is vagueness as applied to the ABC broadcast. Now, the Commission's standards in the 2001 guidance say that this is essentially a two-part test. First, there is a subject matter question, is there a description or depiction of sexual or excretory activities or organs? And then there is a question of whether the depiction or description is patently offensive under community standards for broadcast, informed by three factors, whether the expression is explicit, whether the broadcast dwells on it, and whether it's shocking or pandering or titillating. Now, ABC makes an argument with respect to this broadcast that the nudity in the NYPD Blue episode is outside of the first subject matter criteria because it didn't have fair notice that buttocks would be considered sexual organs for purposes of application of this — of this standard. The Commission said, and this is at page 137a of the appendix to the petition, that it's impossible to believe that they didn't think that the naked display of buttocks would bring them within, that they weren't — didn't have fair notice that the naked display of buttocks would bring them within this rule. I'm not sure anything more needs to be said about that. Kagan. Oh, the broader point, General Verrilli, isn't it, is that no matter — even if you are right that there are many non-vague applications of this Commission policy, that there is some amount of uncertainty, and ABC finds itself in that area of uncertainty. I don't — Because it turns out that nudity has — they're — they're really — sometimes it's allowed as to some body parts and sometimes it's not allowed. And the Commission hadn't really said anything about it for 50 years. And the length of time doesn't seem to be what's indicative of anything. The kind of body part doesn't seem to be, with some limits, what's indicative of anything. So that ABC just didn't really know. With respect, Justice Kagan, I really disagree with that characterization of the situation. Moving to the second part of the analysis here, I think it's important to take a half a step back. The fact of the matter is, and I think everybody, all of us understand this in our experience, that nudity on broadcast television is an exceedingly, exceedingly rare thing in any time of the day, and certainly between 6 a.m. and 10 p.m. It is exceedingly rare, and all of us from our experience know that. And the — Well, I'm not so sure, because the examples were given of, I guess, excerpts from Private Ryan and from Schindler's List have been on television. Yes, that's true, Justice Ginsburg, but, again, I think that's another issue about where the lens is focused. There have been thousands and thousands and thousands of broadcasts, and the Respondents have identified four in which — over 25 years in which any nudity has been present. They have their own guidelines that generally prohibit it, don't they? And that's certainly true, Justice Scalia. And I do think in Reno, this Court described the Carlin monologue at issue in Pacifica in the following way. It said, that monologue was readily identifiable as indecent because it was a dramatic departure from the customary norms for the broadcast medium. I think the kind of nudity — I think if one just looks at the video here and sees it, I don't — I think it's hard to disagree with the proposition that that's a dramatic departure from what's the norm for broadcast television. Ginsburg. If they did an excerpt from Hair, could they televise that? Verrilli, I think it would raise serious questions. I think nudity is going to raise very serious questions. Ginsburg. In the opera, the Micropolis case, there's a scene where a woman is seen nude entering a bathtub, and I suppose that was shown in that scene from the opera. Well, I don't — I think, Justice Ginsburg, that in a context-based approach, there's not going to be perfect clarity. We recognize that. But I do think with respect to this broadcast, and that's the question before the Court, whether FOX — excuse me, whether ABC was on fair notice of whether this broadcast would bring them within the rule. What you're saying is, is that there is a public value in having a particular segment of the media with different standards than other segments. And forget radio. Let's just talk about television. But you know in the briefs it says how much — how many cable stations there are. And you — what do you call it — surfs the — you go through all the channels. And it's not apparent to many people which are broadcast and which are not. But you're saying that there's still a value, an importance, in having a higher standard or a different standard for broadcast media on the television. Why is that when there are so many other options? And when it's not apparent to many viewers which of the two they're watching? Just because it's an important symbol for our society that we aspire to a culture that's not vulgar in a very small segment. Verrilli, Two points in response to that, Justice Kennedy. First, I think the Court's previous decision in this case goes a long way to providing an answer that, yes, it does make a difference to preserve a safe haven where parents want to put their kids down in front of the television set at 8 p.m., they know that there's a segment of what's available that — where they're not going to have to worry about whether the kids are going to get bombarded with curse words or nudity. And then — But this goes — And then there's the chip that's available. Right. And, of course, you ask your 15-year-old or your 10-year-old how to turn off the chip, they're the only ones that know how to do it. And that does point out the problem with the V-chip. Of course, the V-chip is not new. It's been around for more than a decade. And the broadcasters have tried to encourage uptake. The government has tried to encourage uptake. But it has to take — But your point is that the chip technology works better if you have this differentiation between broadcast and cable media. No. A different point. I think the — I want to get to what I think is the fundamental point here, that whatever may be the case with respect to the ability of a viewer to differentiate whether something is a broadcast channel or a cable channel, the reality is that broadcasters are in a different position by virtue of the fact that they have a license from the government that comes with this enforceable public obligation that allows the government to create this safe haven. And that puts them in a different — Well, in a way, that's circular. That's what we're here to argue about. I'm asking, is there a functional, a pragmatic, a practical difference between the two? Is there — well, I'm sorry, Justice Kennedy. The V-chip works with both broadcast and cable transmissions to the extent it works. The — what the briefs have pointed out, and I would suggest in particular that the Court look at the brief from the American Academy of Pediatrics, which does a very thorough job in explaining the many ways in which the V-chip has proven to be a deficient technology, a lot of it goes to the inaccuracy and incompleteness of the codes, the programmers put in to begin with, which have to be there in order for the V-chip to decide what gets through and what doesn't. And I would point out, in this very case, for example, with respect to the — for example, the 2003 Billboard Music Award broadcast with the — the Paris Hilton, Nicole Ritchie back and forth, one would never have known from the code affixed for the V-chip purpose that that broadcast was going to have those kinds of words in them. What will happen when we get to the point where — when there are only a handful of people in the entire country who are still receiving television programs via the airwaves? Well, I do think — we're not there now, as we've said in our brief, but — We're almost there, right, 10 percent? And I do — but that, I think — that really makes what I think is one of the most fundamental points here, is that the broadcasters want to have it both ways, right? They — the Spectrum licenses they have are worth billions and billions of dollars. Spectrum is staggeringly, staggeringly scarce, and — and they're sitting on an enormously valuable resource, which they got for free, and then they have a statutory benefit of must-carry, which gets them on cable systems automatically, and a further statutory benefit of preferred channel placement on — on those systems. Sign me up as supporting Justice Kennedy's notion that this has a symbolic value, just as we require a certain modicum of dress for the people that attend this Court and the people that attend other Federal courts. It's — it's a symbolic matter, and if this is — if these are public airwaves, the government is entitled to insist upon a certain modicum of decency. I'm not sure it even has to relate to juveniles, to tell you the truth. And we certainly agree, Justice Scalia, with the point that was made in the Court's previous decision on this case, that, for example, the words that are in the Fox broadcasts, teachers don't use those words with students. You don't hear those words in churches or synagogues. There are many, many contexts. You hear them on the street. Scalia, you do more and more, since there's so — since there's so much of it on — on the network. And I do think if I may — But you are saying that the standard can still be symbolic, as Justice Scalia said. We want the King's English. When the very children we're talking about, when they go on the street, when they go on the street, their big brother says something to them. It is — the words that were the expletives are in common parlance today. I mean, it is — I think that children — that children are not going to be shocked by them the way they might have been a generation ago. Justice Ginsburg, I think something this Court said in its prior decision is — is right on the mark with respect to this issue, which is it's a question of whether it's appropriate. And when it is — it's one thing when your 13-year-old brother is saying it to you or some bully in the schoolyard is saying it to you. It's another when it's presented to you in this medium as an appropriate means of communication. That's true with respect to the words. It's also true with respect to the nudity, if I might reserve the balance of my time. Thank you, General. Mr. Phillips. Thank you, Mr. Chief Justice, and may it please the Court. I'd like to respond initially to some of General Verrilli's general observations. First of all, he talks about indecency as somehow serving as the core of the overall understanding of the regulatory deal that was made here. And it's difficult for me to accept that notion when there was no effort whatsoever to enforce the standard of indecency between 1927 and 1975. Well, that's because broadcasts didn't commonly have this sort of — these sorts of words or these sorts of images. Well, maybe, maybe not. We don't know. All we know is that for a period of 50 years, nothing happened. So the idea that there was no more understanding of anything. We can — it was not the case from 1927 until whenever you — 1970-something that nudity commonly appeared on broadcast television or the various words we're dealing with here commonly appeared. So it seems a bit much to say, well, they didn't bring any cases for that period. There were no cases to be brought. The only point I'm trying to make, Chief Justice, is that if you're talking about this as sort of the core understanding between the parties, it simply played a fairly minor role in the process through the bulk of the regulatory period we're talking about. And indeed, if you put it in context, this is a statute that prohibits obscenity, profanity and indecency. And while the FCC spent a lot of time writing about profanity as somehow being offended by what went on in this omnibus order, the commission has completely abandoned that under these circumstances. Kagan. And, Chief Justice, Mr. Phillips, look, you've been given a privilege, and that gives the government at least somewhat more leeway to impose obligations on you. Not can't impose everything, but at least has a bit more leeway. And here we've had something that's very historically grounded. We've had this for decades and decades that the broadcast is the — broadcasting is treated differently. It seems to work. And it seems to be a good thing that there is some safe haven, even if the old technological bases for that safe haven don't exist anymore. So why not just keep it as it is? Well, first of all, Justice Kagan, it was important to catch the answer to your question when you asked it to General Verrilli, which was, you're not saying that we lose all of our First Amendment rights. So clearly we retain our First Amendment rights. And under those circumstances — excuse me, you've got this two ways. First of all, the idea that it, quote, worked, it worked perfectly fine from all the way up until 2001, even I would say until 2004, when the Commission wildly changed its approach. And it's only become dysfunctional since 2004. And as we sit here today, literally facing thousands and thousands of ginned up, computer-generated complaints that are holding up literally hundreds of TV license renewals, so that the whole system has come to a screeching halt because of the difficulty of trying to resolve these issues. So to say that the system is working well, it seems to me, at least from the broadcaster's perspective, is to say — is to suggest that's just not true. Alito, when you want us to overrule a decision of this Court, Pacifica. Yes, Justice. Now, as to radio, what has changed? I'm not here to justify that. Well, could we hold that the policy is invalid as to — on First Amendment  Absolutely, Your Honor. Because there are fundamentally different media, and there are different protections, and the circumstances are different, and the Court has recognized that media have to be evaluated individually. But what has happened over the 30 years with respect to the broadcast side of television is a very fundamental change. The cable is now equally pervasive. Cable is now equally accessible to TV. Satellite, equally accessible to TV. But that cuts both ways. People who want to watch broadcasts where these words — or expose their children to broadcasts where these words are used, where there is nudity, there are 800 channels where they can go for that. All we're asking for, what the government is asking for, is a few channels where you can say, I'm not going to — they're not going to hear the S word, the F word. They're not going to see nudity. So the proliferation of other media, it seems to me, cuts against you. Well, it seems to me there are two answers to that. First of all, the notion that one medium operates in a certain way and the exercise of its First Amendment rights can be used as an explanation for taking away or for restricting the First Amendment rights of another medium is flatly inconsistent with what this Court has said across the board in the First Amendment context. You don't balance off one speaker against another and give one favored status and give another favored status. Well, that's your argument there is that it's not a legitimate objective to have a safe harbor. Well, you can get a safe harbor, and indeed there are a number of safe harbors that are out there. First of all, there are a ton of cable networks that are aimed exclusively at children. There are five, six, eight stations that I guarantee you will see — where you'll see none of that language. And second of all, it's always available to the United States government to decide to hold its — to create its own license for the United States to be a broadcaster and to ensure that the broadcast of the United States public network, excuse me, can exclude anything they want to exclude, because that's government speech and is in no way restricted by what the First Amendment would provide. If we rule in your favor on the First Amendment grounds, what will people who watch FOX be seeing between 6 a.m. and 10 p.m.? Are they going to be seeing a lot of people parading around in the nude and a stream of expletives? Not under the guidelines that FOX has used consistently from 10 p.m. until 6 a.m. And, candidly, that all of the other networks follow. The truth is, the advertisers and the audiences that have to be responded to by the networks insist on some measure of restraint, not a measure of restraint. So what will you put on that you are not able to put on now? Well, I mean, some of the things that we could at least wonder about is Saving Private Ryan, Catch-22, perhaps the beginning of the Olympics. There's a whole slew of questions. I mean, and if you go beyond that and you think about what speech has been chilled, the Tillman memorial service is not broadcast because of fear of what's going to be said there. Football games, basketball games, local news events. So suppose we take that particular line. You didn't argue. I mean, FOX didn't argue. FOX was worried about the fleeting expletive policy in Golden Globe. I doubt in Golden Globe when it was before the commission they raised all these vagueness challenges to the whole 2001 policy. So why — here you've taken a much broader stance now, though you didn't before. I mean, you want to say anything about what I think is the basic issue that FOX raises. We don't have to overrule Pacifica. What FOX was penalized for were two women on television who basically used a fleeting expletive, which seems to be naturally part of their vocabulary. And we're worried about small stations that cannot censor people because they don't know what they're going to say. All right. That was what we wrote, I think, in my opinion, anyway. Worried about that. Right. Are you abandoning that argument? No, no, no. Of course not. But you have to realize, Justice Breyer, that what — I mean, the Second Circuit, because it didn't have available to it sort of what to do precisely with Pacifica, tended to focus on the question of vagueness. Vagueness was certainly an argument that we made there because we had to do that. It's an ABC argument primarily, but you made that argument in the Second Circuit. What I'm fishing with you, you don't have to comment more, but is do we have to reach that argument, et cetera. It's a very, very broad question. No, it is absolutely clear to me that if this Court wants to say no more than we decided the outer limits of the First Amendment and Pacifica, and it goes to the verbal shock treatment that Justice Powell described in a separate opinion, and this doesn't come anywhere near that, and therefore this is beyond what the First Amendment provides, the Court could clearly hold that way and rule. Well, that's not really clear. I mean, if you want us to be really clear, you should ask the FCC to simply outlaw any fleeting use of the F-word, of the S-word, any shots of any nudity in any movie, buttocks included, that would give you all of the notice that you need. Why don't you propose that? Boy, that's certain as can be. Well, our basic argument would then be — I mean, obviously what you would be taking away is the vagueness argument, but that would just bring you back then, Justice Scalia, to the core of Pacifica argument and the question of how far can the — how is it permissible to allow the FCC to regulate the broadcast networks on standards that are fundamentally different than cable, Internet, and every other medium that exists? I'd be perfectly happy if they want to try to adopt those kinds of standards and subject them to the strict scrutiny requirements that this Court applies to every other medium, because the truth is those requirements will not withstand scrutiny under those particular standards. Well, broadcast TV is living on borrowed time. It's not going to be long before it goes the way of vinyl records and 8-track tapes. I hope that — I'm sure my client is not thrilled to hear you say that. Well, no, I'm sure — I'm sure your clients will continue to make billions of dollars on their programs which are — which are transmitted by cable and by satellite and by Internet, but to the extent that they're making money from people who are using rabbit ears, that's disappearing. Do you disagree with that? No, I would be — obviously not, because that's why we're not uniquely accessible or uniquely pervasive. Yeah. Well, so why not just let this die a natural death? Why do you want us to intervene? Well, because — well, we didn't ask you to intervene, actually. The FCC is the one who — Well, you're asking us to intervene by overruling a prior precedent. Well, I'd be — well, I think once the issue is before the Court, it ought to decide the First Amendment question that's presented here, and the First Amendment question says what can the FCC do under these circumstances. It seems to me there are probably four different ways you can go about it, all of which says what the FCC did here is wrong. You can say Pacifica is an exceedingly narrow decision. It goes to the outer limits of what the First Amendment allows the FCC to do. What they've done here is unconstitutional. But isn't the inevitable consequence or this precise consequence that you're arguing for on this fleeting expletive portion of this — of this case, that every celebrity or want-to-be celebrity that's interviewed can feel free to use one of these — one of these words? We will just expect it as a matter of course if you prevail. Isn't that the necessary consequence of this case? Well, that they will use it, perhaps, but that doesn't mean that we wouldn't continue to try to bleep it out as best we could, because we have our own standards. Well, I mean, you did in this one, you said, now, remember, you're on television, which was just, you know, giving an added incentive for these vulgar comments. Well, that was clearly not — I mean, from Fox's perspective, it was not scripted to set it up that way. But remember, the first — the first expletive. Isn't it inevitable that this will happen? It is inevitable that — well, I think it's inevitable regardless that people are going to continue to use language that they would naturally use. So, yes, I do think you can expect on cable and any other forum in which you have human speaking that this kind of language will expand. I don't know that — and it will probably be the case that in some context, particularly live television, which is really what's placed in jeopardy by this, that you will have less live television because your concern is people will continue to use this language. On a lot of award shows, I think it's candidly easier to go ahead and bleep this. It's not always — it's not foolproof, but the stations are committed to doing that. They've all got their standards. And that was applied in this particular case. So while there may be some marginal increase in it, if you compare it to the use of this language beyond the broadcast context, it is the — just the narrowest of slivers of increase just as it would be. Kagan.              Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Well the basic cable channels are not restricted by these rules, and I'm just wondering whether you think that there's a difference. Because it has not been apparent to me that there is. Well, I mean, in some — I think it probably depends on which channels you look at. And even in the basic channels. But the — there's the cartoon that's significantly more adult that's on the cable channels than the cartoons that you might see on the FOX television. So, yeah, I think there's probably a certain edgierness to it. But that said, it's still clear that as long as you have advertising revenue that drives a significant amount of the decision-making here, you're going to have the kind of self-restraint that, frankly, ought to cause the Court to say we should no longer — we no longer need to treat the broadcast medium as the weak sister of the media, and therefore they ought to have the same protections that everybody else has, and that they will engage in the same restrained approach to these kinds of issues that newspapers do. I mean, the Post doesn't run the language of the case that's being argued before it. Cable does. All of those media do, because there are natural restraints. You don't need the Federal Communications Commission any longer to ensure under these circumstances. Scalia. What you acknowledge to be the vulgarity of cable suggests otherwise, doesn't  Well, I'm not suggesting that there's some kind of wildly different approach. All I'm suggesting is that there — that in general, most people who rely upon advertising and have to play to a particular audience in order to make their money is going to obviously be restrained. But at a minimum, broadcast will be. It depends what audience you're trying to get and the demographic. If you're trying to get an audience that is older, maybe you will decide this is what's going to attract them. They don't want sanitized language. They want to hear the — all those other words. If your target is a much younger audience, maybe that will happen. But the idea that you're — the problem is going to go away because you're going to be as good as you can be, that seems an odd way to analyze First Amendment problems. Well, no, because I think it ought to go — it ought to be analyzed the exact opposite, which is that the obligation, the burden rests on the Federal Communications Commission and Congress to show that there is a real problem that needs to be solved and that this is narrowly tailored to achieve that. Thank you, Mr. Chief.  Thank you, Mr. Phillips. Mr. Waxman. Mr. Chief Justice, and may it please the Court, when the issue is the content-based regulation of speech, it is the government, not the speaker, that must steer, quote, of the prohibited zone. That foundational principle is nowhere in evidence in the FCC's current enforcement regime, which not only intrudes into the prohibited zone, but also enforces the indecency ban in a starkly inconsistent manner. A regime in which government officials decide, years after the fact, that seven seconds of rear nudity in this particular episode of NYPD Blue is indecent, but 40 seconds of nudity, including full-frontal nudity in Catch-22, is not, that expletives in a documentary about blues musicians is indecent, but even more of those expletives in a fictional movie about World War II is not, is constitutionally intolerable. So people understand, which are demonstrated, I think, is that the context matters. People understand that, including children. When they hear a bad word, when someone hits their thumb with a hammer, they understand that's different than having an adult stand in normal conversation and use the words. And it seems to me that your position is saying that the government cannot regulate with an understanding of what takes place in the real world. The government's effort is to try to understand the context. That's why you get a different rule in saving Private Ryan than you get with Paris Hilton and Nicole Ritchie. And what your argument seems to be is they can't take context into account. On quite the contrary, this Court made clear, and particularly Justice Powell's concurrence in Pacifica, that context is all-important. And just look at this case. Despite, and this goes directly to some of these questions about nudity, despite decades of denying complaints about televised nudity, the Commission chose this case for the first time to sanction nudity on television in a serious drama that had been on for 10 years, that had featured over the course of 10 years. Breyer. I mean, I don't know about this instance. It's called Nude Awakening. It's about the sexual awakening of a child. You ran it, your client, after 10 o'clock on both coasts, and they choose to run it at 9 o'clock for some unknown reason in the Midwest. Maybe they thought, I don't know, whatever. But the other part of it is my point is what the FCC off terribly told you to do was run it one hour later in the Midwest, just as you did on the coast. And why is that not a — I'm not saying — taking this point of view. But I'm saying why isn't that just time, manner, and circumstance that puts you to very little trouble and allows everybody to see it, and therefore is constitutional? This is not some sort of obscure, unknown reason. This show was run across the country in the last hour of prime time, which happens to be from 9 to 10 p.m. in the Midwest and mountain time zones. If you wanted to make more money from it, I understand that. And maybe people would have been a little bit inconvenienced. But the inconvenience, they made a judgment that looking at this show is not like Private Ryan. It's about sexual awakening. They are showing a part of a nude woman. The viewer is supposed to put himself in the position of the boy who's seeing her, and the whole thing was titillating. Now, they might be wrong. There are two sides to that argument. And so I guess what you're arguing is, if I were to say is that a reasonable view, I guess I'd have to say it. But you have to say much — you're telling me I have to say much more than that. Yes. Number one, it is not a reasonable view for reasons that I'll explain. It was not sexual awakening. This was the portrayal in the context of a storyline about the difficulties and embarrassments of blended families. This was an exploration of one of the things that happens, which is a little boy stumbles in and watches a woman in the quotidian activity of preparing her morning shower. In any event, the commission for years had been adjudicating complaints about nudity. And I — it is simply untrue. It is simply untrue that this had never occurred before. NYPD Blue itself was in its tenth season. The very first episode which caused a lot of media attention included a nude scene of lovemaking. It was the subject of any number of complaints. And your question, which you haven't seen where I'm going. I wanted you to say just exactly what you said, and you did, which I thank you. And my question, which I've been trying to get so you see very precisely what it is, is why don't I just say, if you're right, just what you said, and say this is an instance, case by case, in which, for the reasons, then I quote you, that the First Amendment forbids the application of the guideline to this case. In other words, what I'm driving at is the basic thing that's worrying me here. Does this case in front of us really call for the earth-shaking decision that you all have argued for in the briefs? And that's what I'm trying to figure out, and that's why I'm particularly worried about whether or not this whole big argument here was presented to the FCC about whether we have to reach that far. Now do you see where I was trying to get? I think so. And if not, I hope you'll tell me. First of all, the — both First Amendment and Fifth Amendment issues were fully argued in front of the commission, and the commission addressed them in its decision in the ABC case. We, of course, didn't ask the — suggest to the commission that it should no longer apply Pacifica because the factual predicates for more relaxed scrutiny didn't apply, as we didn't in the Second Circuit, because only this Court can reconsider the application of that standard. So that's an argument we're making here. That argument is not necessary to resolving this case either on First or Fifth Amendment grounds. This broadcast, and particularly in light of the ubiquitous V-CHIP, this broadcast is not actionably indecent under Pacifica, number one. With respect to notice or the vagueness of the application to this show, clearly this was a shot out of the blue. The commission cannot identify, I challenge the commission to identify, a single decision of the commission issued before this was broadcast in 2003 in which it had sanctioned any display of nudity. And I'm going all the way back to 1978. Kennedy By sanctioned, you mean punished, as opposed to sanctioned? Waxman Yes, yes, yes. Sanctioned in the ouch sense. Scalia How many displays of nudity were there that went unsanctioned? Waxman Well, for — I can't tell you, but I can tell you based on the familiar justice system. Scalia Well, I mean, if there are very few, it's not a very powerful argument. Waxman Well, I think it's a powerful argument. Let me explain the ones that I know of. 1978, the commission's decision in WGBH, which complained about scenes of explicit nudity in Monty Python's Flying Circus, denied. Catch-22, 40 seconds of nudity, including 10 seconds of full frontal female nudity, denied. The four or five decisions that we saw — that we discuss on page 18 of our brief and that are appended to the merits brief of the ABC affiliates, six — I can't remember whether it's 12 or 16, but more than a dozen episodes of NYPD Blue itself that included displays, graphic displays of nudity during the prior nine seasons, complained about and not adjudicated. That is the backdrop against which the sanctions were taken. Roberts That's what you've got. Roberts I look at 17. Roberts That's what you've got over 85 years. Waxman Well, first of all, we don't have television broadcasts over 85 years, and since there were no reported decisions of any indecency enforcement until Pacifica, I think it's only fair to, as you pointed out yourself, to look at what the commission has been addressing. There right now, I mean, you know, I've cited the ones that are the subject of commission decisions. I haven't cited the one — I haven't attempted to hypothesize about all the other instances. But let's just look at what's at stake here, because the issue, Justice Breyer, is not just notice to ABC in this case. The question is whether the commission standards, as it's currently applying them, are so vague and compassionate that they not only permit arbitrary action, but they are engaging in arbitrary action. Right now, as Mr. Phillips suggested, the commission has pending before it, which it has not denied for years, complaints about the opening episode of the last Olympics, which included a statue very much like some of the statues that are here in this courtroom that had bare breasts and buttocks. It has refused to say that Catch-20 — it's Catch-20 — right over here, Justice Breyer. I mean, there were — well, there's a bare buttock there, and there's a bare buttock here, and there may be more that I hadn't seen. But, frankly, I had never focused on it before. But the point — Me neither. Could ABC or anybody else rebroadcast the Roots series? Could it rebroadcast Catch-22, which the commission is now here saying, oh, no, no, that was just our staff, that wasn't us? In the Saving Private Ryan context, where the commission did say, as a commission, not actionably indecent. But your only conclusion from that is that they can't have any rule. Oh, no. What is the — I looked through the briefs. I don't see what you're — tell me where in these briefs do you suggest what the rule ought to be. In our brief, we don't suggest what the rule ought to be because, A, it's not our Well, we — well, we have to anticipate what the natural results of the consequences of our decision will be. As I understand it, the same rules that we apply to obscenity for printed material, under your view, would apply to television. Well, those rules certainly would apply. And before I say — In other words, if it's not obscene, you can publish it, period. No, no, no, no, no. I'm not suggesting that the indecency proscription in the statute cannot be applied in a constitutional way. I can give you four different— Well, I thought that was the whole gravamen of your argument. No. Our — our arbitrariness argument is that we now have a standard that employs non-exclusive factors that use capacious, vague words that can be balanced any way the commission wants to without explanation for what all the factors are. Isn't that inherent in a context-based approach? Unless you have an approach that says there's certain body parts you can never show, then aren't you going to get into — isn't someone going to be able to come up and say you have this broadcast and you said that's okay, and this one you said is not okay? It certainly is not, and I can offer the Court, or perhaps the commission, four approaches it could take to reduce the astonishing vagueness of the current— Where are they in the briefs? Can you just cite the pages where I will find the alternatives to the present system that don't jump obscenity alone? I don't know the pages. Let me just — I can't remember the pages. Let me just outline what I think, four different things that could ameliorate the vagueness of the current regime.  The first is the emphatically narrow enforcement regime which acknowledged, one, that it had to defer to reasonable judgments of the broadcasters and not exercise the — an editorial eye looking at camera angles, whether something was or wasn't necessary to the message. Number two, it— Roberts I'm going to let you get all four out, but on that, the reasonable deference to the broadcasters, your policy was not to allow people in the situation of Paris Hilton and Nicole Ritchie to use those words. So if they deferred to your reasonable judgment, your friend's reasonable judgment, they would sanction those. I'm not owning Nicole Ritchie, and I think the best answer to the Nicole Ritchie point is that there is a scienter requirement in the statute that, you know, would preclude the application to a good faith effort. But let me just— Okay. Go on to number two. I'll just go back. Well, no, I'm — there are three parts to number one. I'm not being — I'm not— Your time's — I think you are — your time is about to expire. If you want to get your four points out, you better move. Okay. The first one is to revert back to the prior enforcement regime that existed before 2004, which deferred to reasonable judgments, was restricted to material that is not momentary exposure but is dwelled upon, and that, as Pacifica explained, was egregiously material akin to depictions of erotic activity. The second thing they could do is make this three-factor test, or however many factors it is, a test, not just a non-exclusive list of an infinite number of factors that could or couldn't be balanced in any way the commission wants to. Even if it wants to leave it as factors, and this is number three, it could at least identify what they are and apply them consistency — consistently through adjudication that explains why one overbalances the other, which it certainly did not do in this case. And it also could clean up the actual form of the words that it uses, referring, for example, to sexually explicit or expiratory activity. Thank you, Mr. Chief Justice. Thank you, counsel. General Verrilli, you have four minutes remaining. Thank you, Mr. Chief Justice. First, with respect to the notion of self-restraint on the part of broadcasters, I think a little history is in order here. The commission started with the rule that came out of Pacifica. What it faced in the 1980s, with that being the outer bound of the commission's authority, was the explosion of the shock jock phenomenon, the Howard Stern and Bubba Love Sponge and the rest of it, which didn't use any of the seven words in the Carlin monologue, but which was highly vile and lewd, and it required the commission to make a judgment. Now, that was all advertising-sponsored broadcast, and so I do think the risk of a race to the bottom is real. It's history showing. General, I think that the networks really are saying, well, even if some regulation is permissible, the kind of regulation that the FCC has done here is regulation that gives it complete discretion as to what kind of speech to go after and what not to go after, that it has not tied itself in any way to any kinds of standards. And it's, you know, evident in the notion that the way that this policy seems to work, it's like nobody can use dirty words or nudity except for Steven Spielberg. And that there's a lot of room here for FCC enforcement on the basis of what speech they think is kind of nice and proper and good, and that that's a serious First Amendment issue. All right. Well, I disagree. First, that's the lens problem again. We're talking about a tiny, tiny number of the broadcasts that occur in a month, much less a year, much less a decade. So the idea that there's a significant First Amendment problem that encompasses a wide variety of broadcast expression, I just don't think comports with the facts. Second, I do think if one looks at the corpus of decisions that the Commission has made about what's indecent and what isn't, I think one can see with respect to the large majority of them, the vast majority of them, that it's clear which side of the line something fell on. Yes, there isn't perfect clarity. There are going to be some hard cases. But they really have identified what is, in the great scheme of things, a trivial number of hard cases. I don't think one can say that this is a situation like Reno in which there's effectively no standard at all. In Reno, this Court distinguished the Pacifica situation eight ways to Sunday, and I think we've identified them in our brief, and those are valid. I do think there's a significant problem with thinking about Pacifica as the outer bound of the Commission's authority under the First Amendment, in addition to the shock jock problem. Even though the justices involved said this is a narrow decision, both Justice Stevens and Justice Powell. Yes, and, Justice Ginsburg, that's true. And the principles the Commission continues to apply are narrow principles. This is not something that covers a vast array of speech on broadcast. It's a tiny fraction. And so, and I do think if you're talking about Pacifica as the outer bound, the consequences of the shock jocks are fine. The Super Bowl halftime episode with Janet Jackson is fine. You can have as many of these seven-second episodes of NYPD Blue as you want. That's all fine. In fact, anything that's, anything that isn't at that level is fine. And on the other side, you better be careful about calling certain people, certain artists to be interviewed, because even though it's unscripted, there's always a risk they're going to say something they shouldn't say. But a couple answers there. One is the delay in bleeping technology, Justice Ginsburg. And the other one is that there is a scienter requirement under the Commission's enforcement authority here. And so, in that situation, it seems highly unlikely that you would have the requisite scienter that could lead to a forfeiture. Maybe the third is you shouldn't interview these people. Let me spend, if I could, a minute on the NYPD Blue broadcast. The ABC hinges a lot on the notion, Justice Breyer, that this is a non-sexualized episode. I mean, I guess one can make up one's own mind looking at the video. The Commission decided that that was essentially voyeurism. The little boy walks into the room at the very end of that segment of nudity, and I do think that that fully vindicates the Commission's judgment with respect to the nature of that broadcast. Thank you. Thank you, General.